895 F.2d 1413
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Mr. Doris G. HICKMAN, Plaintiff-Appellant,
v.
SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant-Appellee.
 No. 89-5734.
 United States Court of Appeals, Sixth Circuit.
 Feb. 20, 1990.
 
 Before NATHANIEL R. JONES and MILBURN, Circuit Judges, and CARL B. RUBIN, Chief District Judge.*
 PER CURIAM.
 
 
 1
 Plaintiff-appellant Mr. Doris Hickman ("claimant") appeals the judgment of the district court affirming the Secretary's denial of Social Security disability benefits. For the reasons that follow, we reverse.
 
 I.
 A.
 
 2
 Claimant filed an application for disability insurance benefits on May 18, 1984, alleging that he was disabled by back pain and dizziness. The claim was denied initially and upon reconsideration and after a hearing before an ALJ. The claimant then sought review by the district court which remanded the case to the Secretary for consideration of claimant's nonexertional impairments.
 
 
 3
 After taking and considering additional evidence, an ALJ found that claimant was unable to perform his past relevant work but retained the functional capacity to perform other jobs based upon the answer of a vocational expert ("VE") to a hypothetical question. The Appeals Council rejected the ALJ's recommended decision, particularly the factual assumptions underlying the hypothetical and the failure to identify specific jobs which claimant could perform, and referred the case back to an ALJ for further proceedings.
 
 
 4
 After a supplemental hearing, an ALJ again recommended denial of benefits based upon findings that claimant could perform a significant number of jobs which existed in the national economy and, alternatively, that he was able to perform his past relevant work. The Appeals Council adopted the findings of the ALJ, and on May 1, 1989, the district court affirmed the denial of benefits. This timely appeal followed.
 
 B.
 
 5
 At the time of the last administrative hearing, claimant was fifty-four years of age. He has between two and four years of formal schooling with no specialized training and no GED (General Equivalency Degree).
 
 
 6
 Claimant's past relevant work was as a truck driver, coal preparation plant supervisor, and end-loader operator. The truck driving work was classified as medium level work ranging into heavy. The work environment was dusty.
 
 
 7
 At his brothers-in-law's coal plant, claimant's chief duties were helping other employees and making sure they did their jobs. It was a family job, and the family helped claimant with any aspect of the job which required reading or writing. The atmosphere was dusty and the work was light ranging into heavy. Testimony conflicted as to whether claimant hired personnel or merely funneled them through the hiring office.
 
 
 8
 Claimant's last substantial gainful activity ended in June 1983, after six weeks as a end-loader operator. The atmosphere was dusty, and the work was light. Claimant said he left the job because of dizziness and passing-out spells.
 
 
 9
 The only treating physician to submit evidence in this case was Dr. Louis Gomez, M.D., claimant's family doctor. On March 4, 1986, Dr. Gomez opined that claimant was disabled for any gainful employment "due to the lack of retrainability." Dr. Gomez admitted that he based his opinion upon his observations of the claimant as a next-door neighbor as he had last seen claimant as a patient on October 16, 1981.
 
 
 10
 Later, Dr. Gomez diagnosed "severe depressive neurosis" based upon six visits in the period between June 1986 and April 1987. Dr. Gomez presented no clinically observed signs or laboratory findings to confirm his diagnosis.
 
 
 11
 The Kentucky Disability Determination Service ("DDS") sent claimant to Dr. V.D. Modi, M.D., for a consultative examination. On June 21, 1984, Dr. Modi reported:
 
 
 12
 In summary, Mr. Doris Gay Hickman, 50 years of age, mentions of having a history of:
 
 
 13
 1) Shortness of breath, exact etiology possibly acute and chronic bronchitic type of symptoms, very minimal.
 
 
 14
 2) He complains of dizziness, exact etiology undetermined.
 
 
 15
 3) Back pain, minimal limitation, forward flexion of lumbrosacral spine was possible to about 75 to 80 degrees.
 
 
 16
 Chest X-rays revealed that the lung fields were clear of any acute disease. The heart was normal in size and appearance.
 
 
 17
 Dr. Modi re-examined the claimant on August 28, 1986 for similar complaints. A chest X-ray was interpreted as showing pneumoconiosis in all six lung zones. Dr. Modi also noted some evidence of wheezing. However, pulmonary function tests showed "a normal forced vital capacity with no expiratory obstruction." Claimant's spinal examination showed stiffness and pain on movement. Forward flexion was decreased to 60 degrees, dorsal flexion decreased to 20 degrees, and lateral movement was normal.
 
 Dr. Modi concluded:
 
 18
 At the present moment, this patient's working ability has been markedly diminished because of the above mentioned problems. He appears short of breath even at rest. His condition curtails him not to expose himself to coal dust, fumes, or noxious gases. Not only that, he should not bend himself down, should not squat, should not crawl. He should not lift or carry any weight. He should not push or pull because of the above mentioned problems. I feel that he should not handle any machinery. He should avoid extreme changes in temperature.
 
 
 19
 In summary, this patient is totally and permanently disabled because of the above mentioned problems.
 
 
 20
 A treadmill stress test performed on August 16, 1984, by Stephen Edelstein at the request of the DDS was negative for ischemia with no chest pain or electrocardiagraphic abnormality. The test was terminated after 8 1/2 minutes when the claimant complained of dizziness.
 
 
 21
 Dr. Eric Johnson, PhD, performed a consultative psychological examination on the claimant at the request of the DDS on May 31, 1986. Claimant complained of back pain, dizziness, passing out, and nervousness. Dr. Johnson observed that claimant was oriented and rational with no psychotic symptoms. The doctor saw no indication of malingering.
 
 
 22
 When tested by the Wechsler Adult Intelligence Scale ("WAIS"), claimant achieved a verbal IQ of 67, performance IQ of 77, and a full scale IQ of 70. On an oral reading test, he obtained a grade equivalent of 1.5. Personality testing by the Minnesota Multiphasic Personality Inventory ("MMPI") did not suggest psychosis but did suggest somatoform disorder.[1] Dr. Johnson diagnosed somatoform disorder, borderline intellectual functioning, and passive and dependent personality characteristics. For claimant's prognosis, Dr. Johnson stated: "This person is convinced he is not able to work because of his dizziness and passing out when he tries to work." Dr. Johnson saw somatoform disorder as a condition resistant to change.
 
 
 23
 In a medical assessment of claimant's ability to do work-related activities, Dr. Johnson opined that claimant had a "good" ability to do many work related functions. However, claimant had only a "fair" ability to follow complex instructions, deal with work stresses, function independently, and demonstrate reliability.
 
 
 24
 Dr. Johnson re-examined claimant at the request of the government on June 13, 1987, and the diagnosis and test results were largely a duplication of the earlier results. Claimant achieved a verbal IQ of 69, a performance score of 73 and a full scale of 70. Dr. Johnson described claimant's prognosis as guarded and observed that claimant's mental disorder was resistant to change.
 
 
 25
 On June 7, 1986, Dr. Branco, an internist, performed a consultative examination at the request of the DDS. Dr. Branco's physical examination of claimant was largely unremarkable.
 
 
 26
 Dr. Branco finished his report with the following discussion:
 
 
 27
 Dyspnea: Etiology is unclear. Physical examination does not suggest significant lung disease or congestive heart failure. Chest X-ray is unremarkable and spirometry is normal.
 
 
 28
 Chest pain: Etiology is unclear. History is somewhat atypical but compatible with coronary artery disease....
 
 
 29
 Syncope: Etiology is unclear. The history is compatible with vasovagal reaction, that is the common thing.
 
 
 30
 Dr. T.L. Wright, a general practitioner, described claimant as being extremely anxious with inappropriate behavior at times. He found claimant to be alert and cooperative with a short attention span which tended to wander. Dr. Wright found no psychotic symptoms and stated that claimant was fairly knowledgable about current affairs. Claimant was able to subtract seven sequentially from 100. Dr. Wright concluded, after reviewing the records of Drs. Gomez and Johnson, that claimant was totally and permanently disabled by depressive neurosis and somatoform disorder.
 
 
 31
 To Dr. James Weidner, during a June 14, 1987, consultative exam for the DDS, claimant complained of shortness of breath, nervousness, and syncope (ten episodes in the past ten years). Dr. Weidner found normal resonance to percussion in claimant's chest. The cardiovascular rhythm was regular with no abnormal sounds and no evidence of congestive heart failure. Dr. Weidner found no joint deformities or decrease in range of motion. He saw claimant as socially well adjusted with no restriction in his ability to relate to others. Claimant's pulmonary function test was within normal limits. The only abnormalities revealed in a chest X-ray were "several small scattered granulomas in both lung fields [and] ... some evidence of osteoporosis of the thoracic spine."
 
 
 32
 The final item of medical evidence consists of the psychiatric examination performed July 17, 1987, by Dr. Philip Backus, M.D., at the request of the DDS. Claimant complained of syncope, nervousness, and some depression. Dr. Backus described claimant as
 
 
 33
 oriented, relevant and coherent. He showed no marked ambivalence or autistic thinking. He was not delusional nor hallucinatory. He seemed somewhat sleepy, but not really lethargic. He had adequate attention span, concentration and memory. He was not depressed and only minimally anxious. He was somewhat limited, intellecutally. He had adequate judgment.
 
 
 34
 When subtracting 7 sequentially from 100, claimant could reach no lower than 93. Dr. Backus' impression was mild conversion reaction, mild generalized anxiety disorder, possible borderline intelligence, mild speech impediment, and syncope of poorly defined etiology.
 
 
 35
 Dr. Backus reported that claimant had a good ability to do most work related functions. Claimant had only a fair ability to carry out complex job instructions. Dr. Backus stated, "[Claimant's] psychiatric symptoms do not preclude gainful employment."
 
 
 36
 At the final administrative hearing, a VE was asked to assume that claimant was forty-nine to fifty years of age, with a second grade education, no exertional impairments, and non-exertional impairments of borderline IQ and illiteracy. Based upon those assumptions, the VE opined that claimant could perform his past relevant work as well as numerous other unskilled jobs which existed in the local and national economy. Specific examples included machine feeder, vehicle cleaner, production helper, janitor, packaging, greenhouse worker, security guard, and hand solderer. The VE admitted that if claimant's subjective complaints were taken as true, the claimant was not employable.
 
 
 37
 The principal issue presented for review is whether substantial evidence supports the Secretary's findings.
 
 II.
 A.
 
 38
 The scope of judicial review in social security cases is limited to determining whether the Secretary's findings are supported by substantial evidence and whether the Secretary correctly applied the law. Mullis v. Bowen, 861 F.2d 991, 992-93 (6th Cir.1988). Substantiality of evidence must be based on the record as a whole, and "must take into account whatever in the record fairly detracts from its weight." Garner v. Heckler, 745 F.2d 383, 388 (6th Cir.1984) (quoting Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir.1978)).
 
 B.
 
 39
 In this case, the ALJ found that the claimant was severely impaired by a borderline IQ and by illiteracy. He rejected complaints of "pain, discomfort [and] syncope episodes [as] not supported by objective and credible medical evidence." He found that claimant's impairments did not equal or exceed a listed impairment, that claimant could perform his past relevant work, and alternatively, that claimant could perform other work existing in the national economy. The latter findings were based upon the answer of a VE to a hypothetical question which excluded back pain, shortness of breath, dizziness and syncope.[2]
 
 
 40
 Claimant argues that the ALJ did not give proper weight to the combined effects of his impairments and argues specifically that the ALJ improperly rejected his testimony out of hand without making a finding as to his credibility. Where subjective complaints are linked with medical evidence of an impairment, it is essential to appellate review that the Secretary make a credibility determination. Hurst v. Secretary of Health & Human Services, 753 F.2d 517, 519 (6th Cir.1985). Under these circumstances, failure to make a credibility determination undermines the Secretary's conclusion. Id.
 
 
 41
 Claimant testified that when he tried to work he experienced anxiety, dizziness, shortness of breath and syncope. J.A. 199-206. The record shows that claimant's complaints to doctors that saw him were consistent in that he consistently complained of anxiety, pain, dizziness, shortness of breath and syncope. Dr. Johnson noted that he saw no indication of malingering.
 
 
 42
 The ALJ did not discuss claimant's testimony or his credibility. Instead of making a credibility determination, the ALJ stated: "The claimant's subjective complaints, including pain, discomfort, syncopal episodes are not supported by objective and credible medical evidence." Having carefully reviewed the record we find at least some objective medical evidence supportive of claimant's complaints in the form of limitation of back motion, pneumoconiosis, bronchitis and somatoform disorder with symptoms of dizziness and syncope.
 
 
 43
 Given the existence of conflicting evidence, the proper approach was to acknowledge the conflict, acknowledge the corroborating subjective complaints and weigh the evidence accordingly. Hurst, 753 F.2d at 520. The focus on one line of evidence to the exclusion of the other renders the evidence relied upon " 'substantial' only when considered in isolation." Id. at 519 (quoting Zblewski v. Schweiker, 732 F.2d 75, 78 (7th Cir.1984)). Thus, we find that the factual assumptions underlying the hypothetical question posed to the V.E. were not supported by substantial evidence. Therefore, the findings that claimant possessed the capacity to perform past work and other work were not supported by substantial evidence because the hypothetical did not accurately portray claimant's individual impairments. Varley v. Secretary of Health & Human Services, 820 F.2d 777, 779 (6th Cir.1987).
 
 
 44
 Claimant argues that the "Secretary seemed determined to reject out of hand all of the medical diagnosis and the lay testimony in the case at whatever cost." We find telltale signs that the ALJ was straining to deny benefits in this case. Dr. Weidner noted that claimant was possibly prevented from working at heights and around moving machinery. The ALJ passed off the significance of the syncope by commenting that 10 episodes of syncope in 10 years indicated the episodes were so infrequent as to impose no functional limitation. Infrequency would seem to be little consolation given the severe injury that could be expected from passing out and falling from a building or into moving machinery.
 
 
 45
 To avoid a finding of disability, the ALJ tried to discount Dr. Johnson's determination that claimant's verbal IQ was below 69. Dr. Johnson was the only doctor to evaluate claimant's IQ. On Claimant's first consultation, he showed a verbal IQ of 67, a performance IQ of 77, and a full scale IQ of 70. On a second visit to Dr. Johnson, claimant showed a verbal IQ of 69, performance IQ of 73 and full scale IQ of 70. The lower of the verbal, performance or full scale score is the score to be used in determining disability. 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 12.00(D) (1989).
 
 
 46
 Under the listings, a person with a "valid verbal, performance, or full scale IQ of 60 to 69 inclusive and a physical or other mental impairment imposing additional and significant work-related limitation" is disabled. 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 12.05(C) (1989). The ALJ treated claimant's low IQ and his illiteracy as separate, severe impairments. Thus, it would seem that he should have awarded benefits unless there was substantial evidence supporting his rejection of Dr. Johnson's IQ evaluation.
 
 
 47
 The ALJ rejected Dr. Johnson's determination of IQ on the basis of Dr. Wright's observation that claimant could subtract seven sequentially from 100. On the other hand, the ALJ rejected Dr. Wright's opinion that claimant was disabled by mental problems, intimating that Dr. Wright had insufficient credentials. The ALJ failed to explain why Dr. Wright had sufficient credentials to gather objective medical evidence for undermining other doctors, but insufficient credentials for stating a credible opinion about claimant's ability to work. The ALJ must articulate a basis for accepting one portion of a doctor's assessment and rejecting another. Shepherd v. Secretary of Health & Human Services, 758 F.2d 196, 197 (6th Cir.1985), rev'd on other grounds sub nom., Mullen v. Bowmen, 800 F.2d 535 (6th Cir.1986) (en banc). The ALJ also failed to mention that claimant was not able to perform as well for Dr. Backus.
 
 
 48
 This is not the case of weighing conflicting evidence and following the more weighty. The ALJ simply rejected Dr. Johnson's determination in favor of the general statement that claimant had "borderline IQ." The ALJ did not challenge Dr. Johnson's credentials or his diagnostic technique. It is significant that two tests produced nearly identical results. In short, there was not substantial evidence for rejecting Dr. Johnson's finding that claimant's verbal IQ was 69 or below.
 
 
 49
 Claimant has a documented verbal IQ of 67 to 69. He is illiterate. He has documented somatoform disorder with symptoms of dizziness and syncope. We believe this combination meets or exceeds the impairments listed in section 12.05 of Appendix 1, 20 C.F.R. Part 404, Subpt. P.
 
 III.
 
 50
 Accordingly, for the reasons stated, the judgment of the district court is reversed and the case remanded to the district court with instructions to remand to the Secretary for an award of benefits.
 
 
 
 *
 Honorable Carl B. Rubin, Chief United States District Judge for the Southern District of Ohio, sitting by designation
 
 
 [1]
 Somatoform disorders are "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms." 20 C.F.R. Part 404, Subpt. P, App. 1, Sec. 12.07 (1989)
 
 
 [2]
 The Secretary tries to rely upon the answer of a VE to a hypothetical question posed at the second hearing. However, that question also excluded the impairments brought into question here. Furthermore, the Appeals Council rejected the question and the answer used at the second hearing and nothing in the ALJ's discussion indicates that he based any part of his findings upon the question posed at the second hearing